Case number 22-5346, Terry Cash-Darling v. Recycling Equipment, Inc., argument not to exceed 15 minutes per side. Mr. Wall, you may proceed for the appellant. Good morning. Michael Wall for the appellant, Terry Cash-Darling. I'm reserving four minutes of my time. Very well. Good morning. Mr. Wall, could I ask you, right before we get started, we've all been doing this a long time, and I can tell you from my personal standpoint, I don't ever remember reading a brief that seemed to take so many liberties with the record. And when you're called on it, you say, oh, well, it doesn't really matter. Just look to whether there was evidence of specifications. I just got to tell you, that really bothers me. Do you have any explanation as to why you drafted a brief like this? Sure. I can make my argument strictly with evidence that REI presented to the district court and the district court discussed in its summary judgment order. I know you can do that. Why didn't you do that? Why did you put in all this other stuff that you don't even object to the question of whether it's proper or improper? I've just never seen that. Well, in our statement, our background statement of facts, we wanted to just present details about the dates, for instance, when certain events occurred. They're not all critical to the decision before the court, which really comes down to the existence of specifications from the customer. I don't think anyone's suggesting that we took liberties with the fact in the sense of misportraying a fact. It's just that REI is saying that the court is supposed to only consider certain facts that were specifically presented to the district court. And so we are going to assume, let's assume the most stringent version of that rule applies here. I could argue that some of these facts were presented or that REI has not characterized exactly right how they were presented to the district court. But we'll assume today that that rule applies in the most stringent form. So we're saying let's confine ourselves to the facts that were before the district court, that the district court may be discussed in the summary judgment order. And if we do that, we think it's fair to ask, this is the contract specification defense, so where are they? Are there specifications in the record from the customer? And I think if the court asks that question, the conclusion has to be there weren't any. This is an affirmative defense. REI, at summary judgment, had the burden of proving that it received specifications from its customer and that those were related to the defect that caused the machine to explode and kill Paul Cash. There is nothing in this record that could be fairly described as a set of specifications for this machine. The customer did not provide REI with a drawing, a model, a spec sheet, a letter, or even an e-mail telling REI how to make this machine. I agree that that's what normally we would expect to see. But have you been able to find any cases that address the question whether specifications even have to be in writing? I've never seen a case that said they have to be in writing. So assuming that they can be oral, why was not the discussion between LR, I think is what you're saying, LR's representative and REI's representative enough? Not at all. I concede that if the customer had said, and this assumes that this defense is legally viable in Tennessee and we have a legal argument as to that. Would you argue it is not a viable defense in Tennessee in the lower court? That argument was not addressed and briefed in a complete way like we've done on appeal. Was it addressed at all? We said in our response to a summary judgment in the district court that their cases they were citing did not apply Tennessee law and were not applicable in this case. We did not have a very lengthy and detailed argument on that legal issue. We think that legal argument is preserved because the district court reached the merits of this defense and said that those cases were on point and applicable. The district court assumed that it was a viable affirmative defense because you really didn't contest it below. And now you want us to establish what we think is the law in Tennessee as to the contract specification defense when the district court never had a chance to rule on it because it was never presented to them. Normally we're a court of review and not deciding issues on the first crack of it. So I just question whether it's preserved or not as well. Back to answering Judge McKeague's question. Yes. We would concede that assuming this is a legally viable defense at all, that if the customer called up on the phone and said, do not give us a dust collector, it's too expensive, it's going to be in the way, we don't want it. That could support this defense. But here is what Steve Barnett, and this is a critical piece of evidence in the record, which REI presented to the district court. This is how he described what he ordered from REI. He asked for, and I'm quoting, some equipment that was similar to what we had but with a more durable, more heavy-duty shredder, and one that was capable of processing a greater amount of material. And Joey Walls, the employee from REI, testified to the same thing in his deposition. So the customer here is saying, give us a machine that's kind of like what we have and that performs at a certain level that's heavier duty.  He's just saying, give me a heavy-duty machine. That's really it. That is the extent of what the customer said it wanted from REI. Bottom line is, is your position that we should rule that there isn't sufficient evidence to support this defense, assuming that it exists under Tennessee? Are you saying that given the evidence, we should remand this back, and it's a jury question and you try the case? That's right. We didn't move for a summary judgment in the district court, so we're asking the court just to reverse the grant of summary judgment to REI. It's the contract specification defense, so if you don't have contract specifications, we think that's fatal to the defense. We think this declaration from Steve Barnett, at a minimum, creates a genuine issue of fact on that. We really think it disproves the defense because... So you want it remanded or you don't want it remanded? We want it remanded. The summary judgment reversed and remanded, yes. So what Steve Barnett says in his declaration further is that the only concern that the company, the customer, had about this machine was visible smoke, which I guess was obscuring their view in the building. When they had their old machine, it was not dust, and that the only concern he relayed to REI was about visible smoke. So they had fans to evacuate the smoke out of the building, but dust is a separate thing. And he's saying in his declaration, this is uncontested and it's their evidence, that the customer did not have a concern about smoke or dust, excuse me. Combustible dust is what caused the explosion in the machine. So if the customer is not even thinking about this aspect of the design, it certainly isn't giving specifications and instructions to the manufacturer about how to deal with this design aspect. REI, though, was thinking about dust, and we know that for a couple reasons. First of all, as Mr. Barnett said in his declaration, the as-installed system had a baghouse-type filter on the outside of the building. A fan deals with smoke. An air filter, as the name implies, deals with filtering things out of the air, dust particles. So somebody put an air filter on this system, and that was REI. And that's consistent with the invoice for the machine that REI prepared, which said that it would include a dust collector. So the customer has said under oath that he wasn't thinking about dust, wasn't discussing dust or instructing REI about dust, but REI was thinking about dust to some extent. It just didn't put in a functioning dust collector. But the important thing for this defense is that somebody had to make some decisions about this dust collector. Which model to use, which model air filter to use, where to locate it in the system, and how to connect it to the machine, the shredder, with ductwork and so forth. These are all design decisions, and they were not made by the customer. They were made by REI. The evidence is just undisputed on that. That's interesting because I'm looking at page 10 of the district court opinion. It says here L.R. as the employer purchaser of the hammer mill product chose not to include a dust collection device with the hammer mill shredder assembly. And this caused harm. And it says L.R.'s vice president Barnett, not REI, designed the shredder assembly and controlled what safety features would or would not be included. And that's what the district court is saying. You're saying that's wrong? I think, Judge Gilman, you've zeroed in on where we believe the district court went wrong in the facts. As I said before, if, in fact, the customer had chosen, made a conscious, deliberate decision, to reject a feature in the design of this system, that would be a very different case, and that would be problematic for us, assuming this is a viable defense. But let's look at the actual evidence. The evidence, it all goes back to this declaration from Steve Barnett that I've been talking about. And that does not say that the customer chose consciously not to have a dust collector. It says that the customer had no idea about dust, wasn't thinking about dust, and only was talking to REI about smoke. So what the burden, again, this is an affirmative defense, is for REI to prove that it received specifications from its customer related to the defect. And that, according to the declaration of Steve Barnett, just didn't happen. There was no instruction or specification from the customer relating to dust. But I agree, the district court did, I think, misconstrue the evidence when it made that conclusion in the summary judgment order. That's the essence of the error, we believe. Well, you're framing this issue as one that the customer had to have specifically addressed dust in the directions to REI to build this machine. But the flip side of that, and I don't know what the answer to this is, but the flip side of that is they wanted a machine that was similar to the machine that they already had, it was just bigger, it would process more airbags. And I take it the machine that they had didn't have a dust collector, right? I think the record is silent on that. We don't really know about the old machine. It just says that he asked for a machine that was similar to what he had, and that's about it. Why isn't that important to this question? I mean, it might be something for a jury to address, but why isn't it important to know that? Because if that machine didn't have dust collection, and it worked, and it didn't explode, and the guy says, I want a machine like the one I had, I just want one bigger, why isn't that taking the other side of the coin that you're pointing to, why can't you infer from that that he wasn't interested in dust collection because he had a machine that didn't have it, and it worked, and he's fine with that? Well, there's no evidence. In other words, why does he specifically have to address dust rather than circumstantially or indirectly in order for this defense to arguably apply? I'm out of time, but I'll answer your question, Judge McKeague. I think there are two parts to that. The first is the customer, one way or another, has to be specific enough that it's controlling the manufacturer's discretion. The point of the defense is to say if the customer is responsible for the design flaw, then you shouldn't hold the manufacturer liable. So however it happens, whether it's directly in so many words or some other way, it has to be clear and specific enough to control the manufacturer's discretion about dust collection. The record does not say I'm going by the stated rationale for the rule in the restatement. The point of it is that... You don't have a case that says what you just said. I think a lot of the cases... You're paraphrasing the restatement from which this defense is then derived by different courts, I mean different states. Well, there are certainly cases like the Eighth Circuit case, Thompson v. Toronto Tech Seed, that say when there's collaboration between the customer and the manufacturer and they're both kind of involved in working on it, that that's not a clear enough explicit direction from the customer to sustain the defense. Because if there's co-design or collaboration between the two, that's not good enough. And so I don't think there's a crisply stated rule in any of the cases that addresses your exact question. But I think you have to answer that by looking at what the purpose of the rule is. So if the record... And I'm sorry for... I just want to complete my answer. If the record said that or showed that REI had presented its old shredding machine, or excuse me, the customer had presented its old shredding machine to REI and said, duplicate this exactly, except make it a little bit bigger, and it didn't have a dust collector, maybe that would be something that a jury could consider. But that evidence isn't in the record. All we know is that Mr. Barnett called up or talked verbally and said, hey, I have a shredding machine, it's this hammer mill shredder, give me another hammer mill shredder that's similar to what we have but more heavy duty. That's it. And so on this record, I don't think there's any way for REI to prove its affirmative defense. Okay. Thank you. All right. We'll have your rebuttal, Mr. Wall. Good morning. Good morning, Your Honor. May it please the Court, my name is Catherine Kurzmarczuk, and I'm here on behalf of the Apelli Recycling Equipment, Inc., otherwise known as REI. Your Honors, this is a design defect case brought against a manufacturer who did not design the product, in a nutshell. They didn't manufacture the product either, right? It's a used machine? That's correct, Your Honor. It's a seller, a distributor, I mean, I guess they're treated the same as a manufacturer, but he didn't really make the product, right, your client? That's right, Your Honor, and that's the distinction I'd like to make. That's what the thing is. They asked for go get a used machine like the one I've got, as Judge McKeek said, but bigger and faster and, you know, it's got more volume to it. That's right, Your Honor. So they basically just bought a used machine. They bought several used machines and pieced it together at lighting resources design specifications. Actually, your client built a couple of things like the output thing and a couple of other things. It wasn't all just used stuff. The discharge conveyor was actually manufactured by REI. Your client was the systems integrator, was it not? Yes, Your Honor. There were multiple machines that made up the hammer mill shredder system, and lighting resources tasked REI with locating the larger, more durable version of the system that lighting resources already had in place. So REI would go out, locate an infeed conveyor or the shredder system. Lighting resources would approve use of that, and then REI compiled the system. Let's just assume for a second that the old machine had a dust collection system, and they found a bigger one that didn't have one. Would REI win under that set of facts? Could you repeat the question? I'm sorry. Let's assume that the machine that they had that was working had a dust collection system. So that's why there wasn't a dust explosion. And then your client went out and got a bigger machine that didn't have one. Would that change the facts in this case? No, Your Honor, it would not. The REI is relying on the contract specification defense, which gives them, shields them from liability for injuries caused by design defects based on the plans and specifications provided by the customer, unless the design is obviously defective. And that's the part I'm relying on to answer your question, is that obviously defective part. There's no evidence in the record that REI understood or knew of the importance of dust collection. Do they subjectively have to know that, or is that an objective standard, that a reasonable integrator of machines would know that this was unreasonably dangerous? I mean, it's objective standard, isn't it, rather than focus on what REA actually knew? Your Honor, I think that we could look at both. Objectively, would a reasonable integrator have known that? And subjectively, did lighting resources ever convey that information? Had that conversation happened, it would have obviously been important, and REI would have been on notice that lighting resources wanted a dust collector, and that would change the facts substantially. But outside of that, no, it doesn't, because REI was simply compiling a system based on what lighting resources was telling them to do. You say that, but the only plans and specs we see in this record are the ones prepared by, what, Ethan Eichelberger, is that his name, who was an REI employee. And we've got five different drawings, right? And he's your employee, your client's employee, and looking particularly at this box, one of the boxes at the bottom of the plans talks about safety review. You're familiar with that, I assume. And it calls REI the systems integrator and says, please advise your customer of devices that are appropriate for further application based on your safety assessment. And then it says compliance with OSHA and all these other laws are the responsibility of both you as the systems integrator slash distributor and the end user. Well, that certainly makes it sound like REI is part of this process, and it's not just totally dependent on LR. Now, what's your response to that? My response is that the REI, Mr. Eichelberger, the REI employee who prepared the drawing, used that drawing merely to show the dimensions of the system to Mr. Barnett with lighting resources. So that was so that lighting resources could build a room or find space in their facility for that machine that was obviously quite large. And that was the purpose of the drawing. It wasn't actually a design specification for the machine itself. It was to assist the customer in the dimensions of the system. That's what you're saying. Well, why then does all this whole stuff about safety review and all this and pointing to it's a joint responsibility is exactly what this says, doesn't it? Your Honor, we would say that the safety and the case law that we rely on in our response brief is that the safety function allied with the customer because it's the customer who. . . That's not what this says. I mean, that's my problem. And I gather that the burden on L.R. or on Cash Darling is not to prove it's case. It just has to show that there's a genuine dispute of material fact that should have gone to a jury as opposed to being decided as it was on summary judgment. Now, how can you argue that there's not at least some genuine dispute of material fact of whose obligation it was to comply with these safety features? Because Mr. Barnett in his declaration testified that he was not relying on REI for any safety assessment or other review of the safety of the equipment. So there isn't evidence in the record that REI had been tasked with performing any sort of safety protocols. On the contrary, the record is that Mr. Barnett with lighting resources had taken that on. I understand. That's a good argument. But the question is, is that a good argument to make to a jury contrasted with what Eichelberger says in his own plans here? Or is it something that's so clear as a matter of law that the district court could have granted summary judgment? That's what we're facing here. Your Honor, we would say that it is clear as a matter of law. There's an uncontradicted declaration. There's no testimony in the record that contradicts what Mr. Barnett expressly stated in his declaration. Isn't there something in the record, though, that your client actually did consider making connection with a dust collector firm that specialized in dust collection, and then they just didn't pursue it? Your Honor, I'd like to address the dust collection issue because it's being – there are two issues, I think, that are being combined here. And it's unclear exactly on what the appellant is meaning with the term dust collection. The undisputed record shows that at Mr. Barnett's direction, REI installed a fan system at the rear of the building and later installed a larger fan at the front of the building to address visible smoke issues. That Mr. Barnett felt like the placement of this larger fan at the front of the building resolved the issue of visible smoke. And that in his declaration, he testified about the dust collector, specifically saying that as it was referenced on REI's invoice, he believed that the exhaust fans and related parts that I just described were what REI was referring to as an invoice on the dust collector. So there is confusion about what – I think we're unclear on what the appellant means with the dust collector as it's being defined on appeal. Below, the evidence all suggests that the exhaust fans in the system that was put in place was there to deal with the visible smoke dust issue. But the drawing shows a dust collector outside the building. It says dust collector, right? That's different than a fan inside the building in the front and a fan inside the building in the back. So how do you explain that? Well, Your Honor, we go back to the fact that the record indicates that Mr. Barnett with Lighting Resources, who was the one designing this system, he himself testified that the dust collector was the fan system and that he believed it to be all the same. I gather you don't dispute that there is an industry standard that was in place at the time that said if you're shredding metal, you've got to be worried about dust, right? Right. So the question might be, well, as your client, REI, as one assembling all this stuff, should have been aware of that safety standard. Your Honor, I think the focus in this case was not on the dust collection but the airbag charges. So the safety standards were focused on preventing the accumulation of airbag charges that could also cause an explosion. And there was never a conversation about the dust collection aspect of that. And those are being confused here. There is evidence in the record that REI employees thought that the system was very dangerous and scary, but that testimony relates specifically to the airbag charges and not the dust collector, and that has been conflated a bit on appeal. I'm just curious, has anybody sued L.R. if you claim they're the sole responsible party here for the design of this system? Is there a contribution action here? Did Cash Darling sue L.R.? Your Honor, Lighting Resources is Mr. Cash's employer, and it's our understanding that there was a workers' comp action and payout as far as we know. And she did receive, Ms. Cash Darling did receive a remedy. It may not have been the most expansive remedy and tort that she wanted, but there was a remedy for what happened. Well, that's why she's suing REI as this assembler or whatever and not her own employer.  No, Your Honor. Is there a contribution action viable in Tennessee under these circumstances where you have workers' comp? We don't believe so, Your Honor. And I'd like to briefly... How about comparative fault? Is there comparative fault in Tennessee regarding non-parties or not? Your Honor, this was brought under the TPLA, so it's a TPLA claim which subsumes the underlying negligence. So, no, there wasn't a comparative fault action here under the TPLA. Okay. Under Tennessee products liability, they don't have contribution claims? Your Honor, I'm not prepared to speak to that today. All right. Whatever. It's not before us. So I'd like to, unless Your Honor had more questions about that, I'd like to briefly talk about the facts on the record. I guess I do want to just sort of ask a question that maybe summarizes what you've been saying. So it seems, generally speaking, that there's a genuine issue as to whether these specifications were specific enough. So basically what you're relying on largely is L.R., who doesn't have any potential liability, everybody's saying, is coming along and saying, oh, no, no, we didn't rely upon them at all. I mean, that's really the hook here for which you, to be able to say, you had no responsibility for this stuff. Right? Your Honor, what we're saying is that. It's Barnett's declaration. That's your case. We're saying that there were not written specifications provided, but there were specifications provided. Do you have any cases you can cite us where, in fact, the customer had no written specifications and yet the contract specifications defense was viable? No, Your Honor. As Mr. Walsh said, some of the case law on the specifics of written specifications is rather sparse. But on the converse, there is no case law that also says that there has to be written specifications. But all the cases cited by the district court, it's where there were specific written specifications by the customer, right? Yes, Your Honor, typically. But that was, those cases involved a more complicated, complex machine that involved more than the machine we're talking, the system that we're talking about today. The appellant has attempted to make this sound like a very confusing system that required a lot of written specifications. It wasn't. Lighting resources employees would load materials into an infeed conveyor, would transport it to a shredder, and then it would be transported out, and there was a fan system. And on the out, it would be separated into ferrous and non-ferrous materials. This is not an overly complicated piece of system that required written specifications. But you've already said that the employees of REI thought this was a scary, dangerous system. As it relates to airbag charges. But that's the whole point of the system, right? Chopping up airbags. Yes, Your Honor, but that's not what caused the explosion that killed Mr. Cash. What caused the explosion that killed Mr. Cash was aluminum dust. Didn't that come from chopping up airbags? Where did the aluminum dust come from if it wasn't from the airbags? So there's also no evidence on the record that the defect existed at the time that the product left the hands of REI. The defect existed when it was put to its use at lighting resources using seat belt pretensioners. If it had been wood or paper or some other product moving through the system, this would have never happened. So the defect does not exist with the integration of the machine. It's the lack of a component. And it was caused by... Are you saying REI didn't know they were going to also use it for seat belt pretensioners? No, I think that they knew that, but the focus was on the danger caused by airbag charges. I see that I'm out of time. I'm happy to answer any questions. Thank you, Counselor. All right, rebuttal. Four minutes rebuttal. Mr. Wall. My friend on the other side said there's no evidence that the machine was defective when it left REI's hands. The district court specifically found in the summary judgment opinion that that fact was undisputed. REI kept saying it was our burden to prove that but never disputed that it was truly defective when it left REI's hands. So that issue we don't believe is on the table. There's no question that this machine had a new air filter. Mr. Eichelberger's drawings, which Judge Gilman and Judge McKee both referenced, show on one of the pages new air filter on the outside of the building. That's also what Steve Barnett says when he refers to a baghouse type filter. So the question is, who picked that filter? Who put it there? And who connected it with duct work to the shredding machine? And there's no question on this record that was REI. Because as REI has conceded, there was no discussion between the customer and REI concerning dust collection. Mr. Barnett has stated otherwise under oath. When it comes to the specificity of instructions, even if there's not a crisp rule about how specific or the form they need to be in, if you look at the cases that have granted judgment as a matter of law based on this defense, you see the pattern. The customer said something extremely specific about how to make the machine. Use this particular torque nut to hold the axle into place. Carve a door. Leave the door off of the boom, the cherry picker that you use to lift employees up. Something like that. I think in the Hoverman case, the Sixth Circuit case, the district court relied on, there was a spec book of something like 87 pages, something like that. I represent public utilities and they all have spec books like that that say very specifically how things are to be installed, the materials to be used, and so forth and so on. So that is the kind of evidence that a manufacturer needs to get judgment as a matter of law on this defense, and that is simply not here. To answer the question about comparative fault, Tennessee has addressed that question. In the Snyder versus LTG, it's a long German name, I'm not sure how to pronounce it, but the Supreme Court said that in a design defect case, products liability case, the manufacturer is not allowed to attribute fault to the customer if the customer was the employer of the person who got injured. And the reason for that is the worker's comp bar prevents the injured plaintiff from suing the employer. So for reasons of fairness and policy in Tennessee, the Supreme Court does not allow the manufacturer to blame the customer in that way in order to get off the hook. What REI is doing here is essentially the same thing under a different label, but actually it's even worse because in a comparative fault situation, the manufacturer is just saying maybe the customer is 20% at fault, so reduce the damages attributable to us. What REI is doing here is more extreme in the sense that it would be a complete defense. The manufacturer would be totally off the hook by blaming the customer, which is immune from tort liability under the worker's comp bar. And that, we believe, would be an unjust result in this case that's contrary to Tennessee law and policy. The worker's comp insurer here paid to bury Mr. Cash. That was the remedy in this case for the machine that exploded and killed him. And we don't believe it's appropriate to limit the remedies in such a drastic fashion. That is certainly not what Tennessee law requires. Unless the Court has further questions, I'll yield the remainder of my time. Mr. Wall, the only other thing I want to say, and I'm speaking for myself. I'm not speaking for the panel. We see your firm in a lot of different cases. Your firm does a good job. I've never seen anything like this. You put us in a very difficult position when you put a whole bunch of facts in your brief that were not presented to the district court, and then you don't even try to argue that they were actually presented to the district court. So we read these briefs and we read all of these facts, and then you want us to just unlearn them and say, oh, never mind. I'd really encourage you to go back to your partners and explain to them what happened here and tell them that at least one judge is really unhappy with how this brief was prepared, for whatever that's worth or isn't worth. Fair enough? Yes, Judge McKeegan, I apologize for that. I didn't want to go back and forth about the pieces of evidence, but I will say one thing. On the important ones, such as the Tosha report, which REI says wasn't presented to the district court, that's an example of a key piece of evidence that the district court actually discusses in its summary judgment order that REI is saying that we're not allowed to rely on. I don't think it's taking a liberty to cite something like that. I'm not talking about the stuff that the district court actually talked about or the district court relied upon. I don't have any ñ I agree with you. You should be able to talk about that. It's the stuff that, for whatever reason, wasn't ñ it's in the record, but it wasn't presented to the district court. You can't talk about that. All right. Thank you, Mr. Wall. Thank you for your arguments. Case will be submitted.